USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 94-1601 FRANK SIMON, II, Plaintiff, Appellee, v. GERSHON NAVON, Defendant, Appellant. ____________________ No. 94-1602 FRANK SIMON, II, Plaintiff, Appellee, v. JONATHAN NAVON, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Morton A. Brody, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ ____________________ James D. Poliquin for appellants. _________________ C. Donald Briggs, III, with whom Joseph M. Cloutier was on _____________________ __________________ brief for appellee. ____________________ November 27, 1995 ____________________ COFFIN, Senior Circuit Judge. This case arises out of a _____________________ failed business relationship between the plaintiff, Frank Simon, and defendants, Gershon and Jonathan Navon, the sole owners and officers in Maine Coast Trading Company, a fish brokerage firm. A jury found the Navons liable for breach of contract, defamation and abuse of process, and awarded Simon approximately $3.3 million in compensatory and punitive damages. The district court granted defendants' motion for new trial unless Simon agreed to remit $1.2 million, which he did. The defendants now appeal, claiming a host of errors. After a careful review of the record and caselaw, we affirm the court's rulings on the contract claims, but reverse the judgment on abuse of process and remand for a new trial on defamation. I. Background __________ At this juncture, we shall provide only a brief sketch of the facts underlying the case, elaborating in subsequent sections of the opinion as necessary to inform our discussion of specific issues. Maine Coast Trading Company ("Maine Coast Trading" or "MCTC") was formed in November 1990 after Gershon Navon approached Simon about creating a company to broker fish. Navon provided most of the capital to form the business, and he originally received 60 percent of the company's equity. Simon, who had considerable experience in the fish brokerage business, was president of the company and ran its business office in Wiscasset, Maine. A smaller office at Gershon Navon's home in -2- Connecticut primarily handled checking account and line of credit matters. Jonathan Navon, Gershon's son, was treasurer. Maine Coast Trading entered into two significant brokerage agreements, one with a company in which Gershon Navon was the sole shareholder (Mariculture Products, Ltd., "Mariculture"), and one with a company in which Simon had a lesser interest (Aquacorporacion Internacional Sociedad Anonima, "ACI"). Although Maine Coast Trading apparently operated smoothly through 1991, the Navons and Simon early in 1992 were discussing ways to wind down the company's affairs. On March 24, 1992, the parties signed a letter agreement that addressed issues that had arisen between them in the preceding months, outlining the future handling of MCTC business. The agreement did not resolve matters, however, and the parties' relationship grew even more acrimonious. Disagreements arose over which vendors should be paid what amounts and how much money was available in the company's account at Israel Discount Bank in New York. The ensuing events, most of which occurred between April and June of 1992 but whose sequence is in some cases disputed, included: --Simon began holding Maine Coast Trading's receivables in Wiscasset, contrary to the letter agreement's provision that he send those funds "directly to IDB with no delay"; --Jonathan Navon issued a check in the amount of $36,000 as accumulated salary to himself, and a $9,000 check to Mariculture, Gershon Navon's other company, for office rent and expenses. He did not seek Simon's approval for these expenditures, as required by the letter agreement. No previous payments for such items ever had been made; -3- --Simon opened a checking account at Camden National Bank in Maine, deposited accumulated receivables of $68,000, and immediately wired the entire sum to ACI, the company in which he had an interest. Over the next few weeks, other receivables collected by Simon were deposited in this account and checks were issued to various vendors; --Israel Discount Bank froze Maine Coast Trading's account at Simon's request; --At a telephonic meeting of MCTC's board of directors, convened by an attorney in Portland, Maine, the Navons voted to remove Simon as president and elected Gershon to replace him. Simon initially participated in the telephone call, but complained about lack of notice and hung up before the vote; --Several litigations were initiated: ACI filed a civil action against Maine Coast Trading in state court in Maine; an involuntary petition for bankruptcy, signed by Simon as ACI's representative, was filed against Maine Coast Trading; Maine Coast Trading (through the Navons) sued Israel Discount Bank in New York for freezing its account, and later added Simon as a defendant, increasing the damages request from $87,000 (the amount of funds in the account) to $30 million. Simon filed this lawsuit in October 1992, alleging breach of contract, defamation, negligent and intentional infliction of emotional distress, tortious interference with contract and malicious prosecution. The district court granted summary judgment for defendants on the tortious interference claim, and granted judgment as a matter of law on the claims for negligent and intentional infliction of distress. At the close of all evidence, the court recharacterized the malicious prosecution claim as a claim for abuse of process. The jury found both Navons liable on each of the three remaining claims -- breach of contract, defamation and abuse of process -- and awarded a total -4- of $2.3 million in compensatory damages and punitive damages of $1 million against Gershon and $36,000 against Jonathan. In acting on defendants' post-judgment motions, the district court found the $2.3 million in compensatory damages "clearly excessive and against the weight of the evidence," and ordered a new trial if Simon failed to accept a remittitur of $1.2 million. He agreed to the remittitur, and this appeal by the Navons followed. They claim entitlement to judgment or a new trial on each of the substantive claims, as well as on damages. They further argue that they are entitled to a new trial on all issues based on a series of circumstances that infected the jury's verdict with undue passion or prejudice. We address each of these issues in turn, after briefly considering the relevant standards of review. II. Standard of Review __________________ The district court rejected the Navons' post-trial motion for judgment as a matter of law because they failed to make that request at the close of all evidence, thus forfeiting the right to such a determination. See Keisling v. Ser-Jobs for Progress, ___ ________ ______________________ Inc., 19 F.3d 755, 758-59 (1st Cir. 1994); Della Grotta v. Rhode ____ ____________ _____ Island, 781 F.2d 343, 349 (1st Cir. 1986); Fed. R. Civ. P. 50(b). ______ Once abandoned, a claim for judgment as a matter of law may not be revived on appeal except upon a showing of plain error resulting in a manifest miscarriage of justice. Shell v. _____ Missouri Pac. R.R. Co., 684 F.2d 537, 540 (8th Cir. 1982); ________________________ -5- Martinez Moll v. Levitt & Sons of Puerto Rico, Inc., 583 F.2d ______________ ____________________________________ 565, 570 (1st Cir. 1978).  The court did reach the merits of defendants' alternative request for a new trial, which may be granted notwithstanding the failure to make a pre-deliberations request for judgment as a matter of law. See Wells Real Estate v. Greater Lowell Bd. of ___ __________________ ______________________ Realtors, 850 F.2d 803, 810 (1st Cir. 1988); Fed. R. Civ. P. 59; ________ 9A C.A. Wright & A. Miller, Federal Practice and Procedure  ________________________________ 2539, at 362 (1995). The court denied a new trial on the substantive claims, but, as noted earlier, granted a new trial on damages contingent on the remittitur. Defendants now challenge the court's refusal to further disturb the jury's verdict. Our review, however, is extremely circumscribed; we may reverse the court's decision only for an abuse of discretion. Sanchez v. _______ Puerto Rico Oil Co., 37 F.3d 712, 717 (1st Cir. 1994). With this ___________________ limitation in mind, we turn to appellant's claims of error. III. Malicious Prosecution and Abuse of Process __________________________________________ In his complaint, Simon alleged a cause of action for malicious prosecution based on the lawsuit filed by the Navons in New York in the name of Maine Coast Trading. That action, first brought against Israel Discount Bank to obtain release of $87,000 frozen in the company's account, later was amended to include a claim against Simon seeking $30 million in damages and injunctive relief. Twice during the trial, the parties and the district court displayed confusion about the malicious prosecution claim and its elements, and considered whether the claim would be more -6- aptly characterized as one for a related tort, abuse of process. Ultimately, over the defendants' objection, the court amended the pleadings to substitute abuse of process for the malicious prosecution count, and the jury returned a verdict for Simon on that claim.1 The Navons argue that the district court's handling of this issue was erroneous in two respects. First, they claim that amendment of the pleadings after the close of evidence was unfairly prejudicial because their strategy was based on the assumption that Simon would be unable to prove a necessary element of malicious prosecution, namely, that the challenged litigation had terminated in his favor.2 Second, they claim that Simon failed as a matter of law to prove the elements of abuse of process. We address only this latter claim. Preliminarily, however, we must determine whether, unlike other grounds asserted in the  ____________________ 1 We note that some jurisdictions distinguish in nomenclature between claims alleging malicious instigation of process in criminal and civil cases. Where the distinction is recognized, "malicious prosecution" refers to criminal proceedings and "malicious use of process" or "wrongful civil proceedings" applies to civil cases. See W. Page Keeton, et al., ___ Prosser and Keeton on The Law of Torts 120, at 892 (5th ed. _________________________________________ 1984); Note, "The Nature and Limitations of the Remedy Available to the Victim of a Misuse of the Legal Process: The Tort of Abuse of Process," 2 Val. U.L. Rev. 129, 130 (1967). To the extent there are differences between the two causes of action, see ___ Restatement (2d) of Torts 653, 674 (1977), they are irrelevant _________________________ to our discussion here.  2 It appears that that action was stayed because of Maine Coast Trading's bankruptcy. So far as we can ascertain, neither the original complaint nor the amended complaint naming Simon is a part of the record in this case. -7- post-trial motion for judgment as a matter of law, the issue was preserved by timely request at the close of evidence. The parties' final discussion with the court on the malicious prosecution claim occurred during a chambers conference after the close of all the evidence. The conference, focusing on the difference between claims for malicious prosecution and abuse of process, occupied seven pages of transcript. The court concluded the conference with the following statements: I think it's a very, very thin argument, frankly, on abuse of process . . . . But I'm going to let this case go to the jury because I'm not going to try this case again if I can help it. And then we'll see what the jury does with it subject to a motion for a judgment N.O.V. after we see how they answer the interrogatories on the case. And you can take your objection. Tr. at 835. Counsel then promptly stated, "I object." In its post-judgment opinion, the district court stated that defense counsel could not reasonably have believed that this colloquy preserved the issue for post-verdict review but noted the argument by defendants' new counsel that the chambers discussion had served as the functional equivalent of a motion for judgment as a matter of law. The court observed, however, that treating that dialogue as a de facto motion relating to __ _____ abuse of process nonetheless would be unavailing because the evidence legally was sufficient to go to the jury. Even in the light of our own stringent adherence to the requirement of a timely formal motion, we think the abuse of process issue was adequately preserved. The lengthy discussion on this point, taken together with the judge's expressed -8- assumption that he would revisit the question in the event of a motion for judgment notwithstanding the verdict, and his statement to the attorney that he could "take [an] objection," could not but have led counsel to believe that what had been done thus far was enough to preserve the issue for post-judgment review. Indeed, the colloquy in chambers was the type of exchange that one would expect to follow a motion for judgment as a matter of law on the abuse of process claim. Cf. Bayamon Thom ___ ____________ McAn, Inc. v. Miranda, 409 F.2d 968, 971-72 (1st Cir. 1969).3 __________ _______ In these circumstances, we conclude that the legal sufficiency of the abuse of process claim warrants appellate consideration.4 We thus turn to the substantive inquiry, which  ____________________ 3 Bayamon Thom McAn and several subsequent cases, see ___________________ ___ Keisling v. Ser-Jobs for Progress, Inc., 19 F.3d 755, 759 (1st ________ ____________________________ Cir. 1994); Della Grotta v. Rhode Island, 781 F.2d 343, 349-50 ____________ ____________ (1st Cir. 1986); Beaumont v. Morgan, 427 F.2d 667, 670 (1st Cir. ________ ______ 1970), recognize a limited exception to the requirement that a motion for judgment as a matter of law -- though made at the close of plaintiff's case -- must be renewed at the close of all the evidence. The exception is permitted "in a case combining . . . judicial assurance concerning preservation of rights at the time of motion and . . . brief and inconsequential evidence following the motion. . . ." Bayamon Thom McAn, 409 F.2d at 972. _________________ The instant case seems to us an even more modest departure from the formal procedures for preserving a claim for judgment as a matter of law. 4 Our decision in Martinez Moll v. Levitt & Sons of Puerto _____________ ________________________ Rico, Inc., 583 F.2d 565, 568-70 (1st Cir. 1978), refusing to __________ consider appellant's sufficiency argument, is not inconsistent with this result. In that case, the appellant had moved for a directed verdict on other grounds at the close of all the evidence, but had failed to question the sufficiency of the evidence. Because the issue had never been raised until after the jury's verdict, we concluded that there was "no basis . . . for treating the present case as one where there was substantial compliance with the Rule." Id. at 570. We noted, in addition, ___ that "the court did nothing that could reasonably have caused [defendant] to believe that all had been done that was necessary -9- is governed by a de novo standard of review. Gibson v. City of __ ____ ______ _______ Cranston, 37 F.3d 731, 735 (1st Cir. 1994).  ________ It is not surprising that the court and parties were uncertain about how to characterize Simon's claim based on the New York litigation. The torts of abuse of process and malicious prosecution frequently are confused because of their close relationship, see, e.g., Lambert v. Breton, 127 Me. 510, 514, 144 ___ ____ _______ ______ A. 864 (1929); Board of Education of Farmingdale Union Free Sch. _________________________________________________ Dist. v. Farmingdale Classroom Teachers Ass'n, 38 N.Y.2d 397, _____ ______________________________________ 400, 343 N.E.2d 278, 280-81, 380 N.Y.S.2d 635, 639-40 (1975); Note, "Abuse of Process," 13 Clev.-Mar. L. Rev. 163, 163 (1964) ("Abuse"); Note, "Torts -- Abuse of Process Defined," 28 Ark. L. Rev. 388 (1974) ("Defined"), and abuse of process has been described as "one of the most obscure torts in the law," see ___ Note, "The Nature and Limitations of the Remedy Available to the Victim of a Misuse of the Legal Process: The Tort of Abuse of Process," 2 Val. U.L. Rev. 129, 129 (1967) ("Tort of Abuse"). To establish a claim for malicious prosecution, a party must show that the challenged litigation was initiated without probable cause and with malice, and that it terminated in the plaintiff's favor. See, e.g., Nadeau v. State, 395 A.2d 107, 116 ___ ____ ______ _____ (Me. 1978). The two basic elements of abuse of process are a bad motive, and the use of a legal process for an improper, collateral objective. See, e.g., id. at 117. ___ ____ ___  ____________________ to preserve the issue for review." Id. In both of those ___ respects, this case is distinguishable. -10- The difference between the two often is explained as a matter of timing and scope: malicious prosecution is the appropriate cause of action for challenging the whole of a lawsuit -- i.e., asserting that the suit has no basis and should not have been brought -- while abuse of process covers the allegedly improper use of individual legal procedures after a _____ suit has been filed properly. See Packard v. Central Maine Power ___ _______ ___________________ Co., 477 A.2d 264, 267 (Me. 1984); Nadeau, 395 A.2d at 117; Wade, ___ ______ J., "On Frivolous Litigation: A Study of Tort Liability and Procedural Sanctions," 14 Hofstra L. Rev. 433, 450 (1986). Typical abuse of process cases involve misuse of such procedures as discovery, see Twyford v. Twyford, 63 Cal. App. 3d 916, 923- ___ _______ _______ 24, 134 Cal. Rptr. 145, 148-49 (1976); subpoenas, see Board of ___ ________ Education of Farmingdale Union Free Sch. Dist., 38 N.Y.2d at 403- ______________________________________________ 04, 343 N.E.2d at 283, 380 N.Y.S.2d at 642-43; and attachment, see Saliem v. Glovsky and Fogg, 132 Me. 402, 404 172 A. 4 (1934). ___ ______ ________________ The abuse tort often is given a wider berth, however, and courts typically will recognize such a claim, regardless of timing, if a plaintiff can show an improper use of process "for an immediate purpose other than that for which it was designed and intended," Restatement (2d) of Torts 682, at 475 (1977). __________________________ See W. Page Keeton, et al., Prosser and Keeton on The Law of ___ ___________________________________ Torts 121, at 898 (5th ed. 1984) (cases requiring an act after _____ process has issued "probably stand only for the narrower proposition that there must be an overt act and that bad purpose -11- alone is insufficient"). This results in an overlap between malicious prosecution and abuse of process: a defendant who explicitly threatened to file a baseless lawsuit solely for the purpose of forcing the plaintiff's action in an unrelated matter, and then did commence suit, could be held liable for either tort.5 In such a case, the otherwise normal procedure of filing a lawsuit is transformed into an act of abuse by the coincidence of the threat.6 Recognizing these two approaches puts the confusion below into perspective, but we need not dwell on their relative merits and applicability here because not even the broader view provides Simon with a basis for recovery. Simon's claim is premised on the Navons' amendment of the New York litigation to include him as a defendant. Even if Maine law, which applies to this diversity case, would recognize an abuse of process claim based  ____________________ 5 Interestingly, the Georgia courts and legislature have merged the two torts into a new abusive litigation tort. See ___ Yost v. Torok, 256 Ga. 92, 95-96, 344 S.E.2d 414, 417-18 (1986); ____ _____ Block v. Brown, 199 Ga. App. 127, 130, 404 S.E.2d 288, 291 _____ _____ (1991). 6 When abuse of process is based on conduct subsequent to initiation of the lawsuit, the requirement of an "act" of abuse typically would be satisfied by showing use of the individual legal process in an improper manner. See, e.g., Board of ___ ____ _________ Education of Farmingdale Union Free Sch. Dist. v. Farmingdale _________________________________________________ ___________ Classroom Teachers Ass'n, 38 N.Y.2d 397, 343 N.E.2d 278, 380 _________________________ N.Y.S.2d 635 (1975) (subpoenas issued for 87 teachers for the same day, paralyzing normal operations of the schools); Saliem v. ______ Glovsky and Fogg, 132 Me. 402, 172 A. 4 (1934) (excessive __________________ attachment). -12- on the instigation of a lawsuit,7 Simon can prevail only if he proves the two requisite elements of the cause of action: ulterior motive and an act of abuse. See Nadeau, 395 A.2d at ___ ___ ______ 116; Saliem, 132 Me. at 405. ______ Filing of a lawsuit is a "regular" use of process, and therefore may not on its own fulfill the requirement of an abusive act, even if the decision to sue was influenced by a wrongful motive, purpose or intent. Saliem, 132 Me. at 405-06; ______ see also, e.g., Vahlsing v. Commercial Union Ins. Co., 928 F.2d ___ ____ ____ ________ _________________________ 486, 490 (1st Cir. 1991) (applying Texas law); Baubles & Beads v. _______________ Louis Vuitton, S.A., 766 S.W.2d 377, 379 (Tex. Ct. App. 1989); ____________________ Grell v. Poulson, 389 N.W.2d 661, 663-64 (Iowa 1986). And, _____ _______ although wrongful motive in the context of an abuse of process claim may be inferred from an improper act, the reverse is not true. Saliem, 132 Me. at 405; Sage Int'l, Ltd. v. Cadillac Gage ______ ________________ _____________ Co., 556 F. Supp. 381, 389 (E.D. Mich. 1982) (citing Prosser). ___ _______ It therefore may not be presumed that the Navons filed the New York lawsuit solely to achieve a collateral objective based on evidence of motive alone. Simon needed to produce evidence independent of motive to prove that an improper act occurred in the Navons' pursuit of the litigation.  ____________________ 7 For purposes of the timing distinction drawn by the courts and commentators, we think it evident that amendment of the complaint against Israel Discount Bank to include a claim against Simon must be viewed as the initiation of process, rather than as a subsequent act. Process against Simon originated with the new complaint, and that is logically where the analysis of any litigation-related tort claim by him must begin as well.  -13- Simon has failed to offer such evidence. As an initial matter, it is not seriously disputed that the allegations in the complaint, which sought to state a cause of action for malicious prosecution, are inadequate to make out an abuse of process claim. The complaint alleges only that the defendants filed a lawsuit maliciously "and probable cause for said lawsuit was lacking." Lack of probable cause is an element of a malicious prosecution claim, but is not a prerequisite for recovery for abuse of process. In his brief, Simon supports the abuse of process claim by pointing to trial evidence of the deteriorating business relationship with the Navons and testimony indicating that the Navons routinely used litigation in business disputes. Simon highlights the amendment of the bank suit and the request for $30 million in damages and injunctive relief. He further claims that "activities took place in New York causing the Plaintiff to expend $60,000 in his own funds to defend himself from a baseless lawsuit." Although Simon suggests that the demand for high damages and the imposition of defense costs were "abusive," there is nothing per se irregular in a plaintiff's filing a complaint that seeks ___ __ high -- even unrealistic -- damages,8 or in causing a litigation opponent to spend money in defense. Indeed, at one point during  ____________________ 8 To the contrary, a multi-million-dollar damage request strikes us as a fairly routine feature of modern lawsuits. We would not like to contemplate the litigious scene if the law recognized inflated ad damnum requests as meeting the "act" requirement of abuse of process. -14- colloquy with the court, Simon's counsel acknowledged that the bringing of a $30 million lawsuit is not in itself an abuse of process, and argued that what was significant was the evidence of motive. But, as we have seen, a showing of bad motive in connection with "regular" process is not enough. See supra at 12-13. To ___ _____ satisfy his burden, Simon needed to show a specific link between the New York lawsuit with an impermissible, collateral purpose of the Navons. This requirement could have been satisfied, for example, with evidence of a threat made explicitly to Simon or a disclosure confided to a third party that the Navons planned to file suit solely to hurt Simon's credit rating. See Sage Int'l, ___ ___________ 556 F. Supp. at 388-90 ("Plaintiff must allege that defendant committed a specific act which was directed at the collateral, ulterior objective. . . . In sum, there must be some basis [for finding]. . . that the improper act was the means to further the improper purpose.")9 We think it fairly evident that Simon did not present such evidence because it does not exist, and that the claim he originally brought -- malicious prosecution -- was better suited to the facts. His problem, as the district court recognized, was that a claim for malicious prosecution would remain premature as  ____________________ 9 Although not cited in Simon's brief, during colloquy concerning the Navons' motion for judgment as a matter of law at the end of plaintiff's case, Simon's counsel referred to a statement by Gershon Navon to his client that "I'm going to crush you." This was simply evidence of motive; Simon provided no link between the statement and the New York litigation. -15- a matter of law until the New York lawsuit ended. Revising the claim into one for abuse process, however, involved something like trying to fit the proverbial square peg into a round hole. The facts and the law simply were incompatible.10 In the malicious prosecution context, the requirements of lack of probable cause and favorable termination of the litigation ensure that a defendant is not found liable simply for having a bad motive; these elements support a finding that the lawsuit was baseless. Similarly, proof of a specific act in an abuse of process setting provides concrete assurance that a process actually has been abused, and that liability will not be based on the badly motivated use of procedures that perhaps were burdensome but not improper -- a basis that would indeed dramatically lower the threshold of viable abuse of process litigation. See Westmac, Inc. v. Smith, 797 F.2d 313, 321 (6th ___ ______________ _____ Cir. 1986) (Merritt, J., dissenting) (proof of specific conduct "limits the dangers of inquiry into . . . subjective purpose"). Significantly, the need to prove an act also distinguishes a claim for abuse of process in initiating litigation from a premature claim for malicious prosecution; if the factfinder were permitted to infer abuse, a plaintiff able to show bad motive  ____________________ 10 The only case cited by Simon in support of his contention that amending the suit, seeking injunctive relief, and imposing excessive legal fees constitute acts of abuse of process is Baubles & Beads v. Louis Vuitton, S.A., 766 S.W.2d 377 (Tex. Ct. _______________ ___________________ App. 1989). That case could not be more unhelpful to his position. Not only was the claim there based on a typical post- filing procedure -- an ex parte seizure order -- but both the trial and appeals courts found that there had been no abuse of process.  -16- often would be able to offer a convincing argument that the challenged litigation was brought for an improper purpose connected to the bad feelings. This is, in essence, what Simon sought to do. Such an approach, however, renders the malicious prosecution tort irrelevant.  This is not to say that a plaintiff can litigate with impunity, so long as he does so without explicit threats concerning collateral matters. Rule 11 of the Federal Rules of Civil Procedure authorizes judges to sanction parties or attorneys who file pleadings, motions or other papers "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation," a determination left to the considered judgment of the court. Fed. R. Civ. P. 11(b), (c). Federal courts have inherent power to sanction parties and attorneys for abuse of the litigation process, even in diversity cases, Chambers v. Nasco, Inc., 501 U.S. 32, 44-55 ________ ___________ (1991), and trial courts in Maine likewise have such authority, Chiapetta v. LeBlond, 544 A.2d 759, 760 (Me. 1988). Tort _________ _______ recovery, however, is limited to those instances in which plaintiffs are able to prove the elements of the abuse of process cause of action. Because Simon presented no evidence of "an act in the use of process other than such as would be proper in the regular prosecution of the charge," Saliem, 132 Me. at 405, the jury's ______ verdict on that count must be reversed. IV. Defamation __________ -17- Simon alleged that the Navons defamed him by telling several creditors of MCTC that he was responsible for the company's lingering debts, and by causing an attorney to write a letter in July 1992 to Camden National Bank stating that the account Simon had opened there was unauthorized and was being used "to divert and dispose of a substantial amount of payments received by him in collecting MCTC's receivables."11 The Navons argue that the letter, which was the primary element of the defamation count,12 cannot as a matter of law support the claim because its contents were both true and privileged and because the Navons as individuals could not be deemed responsible for the content of a letter written by someone else. We reach only the first of these contentions.   ____________________ 11 The full text of the letter, which was signed by Attorney Andrew A. Cadot and addressed to the bank's president, is as follows: We are attorneys for Maine Coast Trading Co., Inc. ("MCTC"). We understand that an account was opened in the name of MCTC by Frank Simon II. This account was not authorized by MCTC, but, we understand, has been used by Mr. Simon to divert and dispose of a substantial amount of payments received by him in collecting MCTC's receivables. Please accept this letter as MCTC's instruction not to permit any further transactions in the account without our prior approval on behalf of MCTC. In addition, we request that you provide us with copies of the documents used to open this account and all records of transactions in the account. 12 Indeed, it was the sole basis for a finding of defamation against Jonathan Navon, as all of the other statements were made by Gershon. -18- As explained earlier, our review should be limited to a determination whether the district court abused its discretion in rejecting defendants' motion for a new trial. The district court, however, did not address the defamation issue in its opinion, although the point was raised in defendants' motion; we therefore have no basis upon which to evaluate its ruling. Consequently, we have considered not whether the district court abused its discretion in denying the Navons' motion, but whether a new trial is necessary because the jury's verdict was so clearly against the weight of the evidence as to constitute a manifest miscarriage of justice. See Quinones-Pacheco v. ___ ________________ American Airlines, 979 F.2d 1, 3-4 (1st Cir. 1992); Wagenmann v. __________________ _________ Adams, 829 F.2d 196, 200-201 (1st Cir. 1987). _____ The Navons assert that the letter was not defamatory because it was not false. They emphasize that Simon conceded at trial that MCTC's bylaws reserved check-writing authority to the Navons. Moreover, they point out, Simon acknowledged that he had no authorization from MCTC's board of directors to open the Camden National Bank account. The Navons claim that these undisputed facts prove the accuracy of Cadot's statements that the "account was not authorized by MCTC," and that Simon had been "divert[ing] and dispos[ing]" of MCTC funds. In response to the evidence regarding his corporate authority under the bylaws, Simon offered only his subjective belief that he had the authority to do what he did and the fact that his lawyer advised him to take such steps. We think this -19- falls well below what is necessary to negate the defendants' showing based on the company's bylaws, which presumably represent the parties' agreement on the scope of, and limitations on, their powers. Neither Simon's belief that the actions he took were justified, nor his lawyer's unexplained concurrence in that belief, can support a finding that his conduct was authorized by MCTC. The letter may have been misleading in revealing so little about the nature of Simon's unauthorized conduct, but, on this record, it could not be deemed false. We therefore conclude that the Navons met their burden of establishing that the challenged statements were true, and thus not actionable. See, e.g., Haworth v. Feigon, 623 A.2d 150, 158 ___ ____ _______ ______ n.6 (Me. 1993) (truth is an affirmative defense in defamation action); Picard v. Brennan, 307 A.2d 833, 834-35 (Me. 1973) ______ _______ (same). Even if Simon had some general authority as president to take actions that he felt were in the best interest of the company -- a possibility we cannot consider since the record on appeal contains neither the bylaws nor other evidence of such authority -- it still would be true that MCTC had not authorized ____ the account. Simon remained a minority shareholder, and the Navons constituted a majority of the board of directors. In addition, if the account and check-writing were unauthorized, the letter also was accurate in reporting that Simon had "divert[ed] and dispos[ed]" of MCTC receivables, the word "diversion" typically being associated with the unauthorized use of funds, ____________ see Black's Law Dictionary (6th ed. 1990), at 477.  ___ ______________________ -20- The jury's verdict did not specify the statements on which defamation liability was premised, and our conclusion that the Cadot letter could not support the claim on this record therefore requires a new trial on defamation.13 In addition to the letter, Simon alleged that Gershon defamed him in several statements made to his colleagues or customers in the fish industry.14 Although in our view these statements, too, provide a flimsy premise for defamation liability, the Navons have not urged as a basis for appeal that they are inadequate. In any event, we leave the specific contours of the new trial to the discretion of the district court after consultation with the parties. V. Breach of Contract and Damages ______________________________ The Navons also argue that they are entitled to judgment or a new trial on the breach of contract claim because the evidence presented was insufficient to support a finding for Simon. The district court rejected the motion for new trial on this issue,  ____________________ 13 The Cadot letter, of course, may be admissible at a retrial should Simon develop a different record. 14 In closing arguments, counsel for both Simon and the Navons emphasized in particular an April 14, 1992 letter written by Gershon to the vice president of ACI, in which Navon blamed Simon for the delay in MCTC's payments to ACI. Navon also accused Simon in the letter of various actions that "rob[bed] MCT from its ability to conduct business." The two other bases for defamation cited by Simon's counsel in argument involved statements by Gershon to MCTC creditors laying blame on Simon for MCTC's delinquent accounts. -21- concluding that the jury instructions properly and completely set out the relevant law and that the jurors presumably followed the instructions in reaching their verdict. Having read the trial transcript in its entirety, we find no abuse of discretion in the court's denial of a new trial on this issue. Simon presented ample evidence that the Navons agreed toward the end of March 1992 to pay certain crucial creditors of MCTC promptly -- a promise that a jury could find to be implicit in the written agreement of March 24th -- but then failed to do so despite Simon's urgent pleas and the availability of adequate funds. Although the defendants presented a different version of events -- laying the blame for the delinquencies on Simon for cancelling the IDB line of credit -- the judgment between the conflicting accounts was for the jury to make. In addition, the jury was entitled to believe Simon's testimony that he did not retain MCTC's receivables and open the account at Camden National Bank until after the Navons breached an express provision of the _____ March 24th agreement by paying themselves a total of $45,000 without his permission. As we have noted, our review at this stage is extremely deferential; whether or not we would have reached the same conclusion were the factual question ours to resolve in the first instance, we cannot say that the district court erred in allowing the jury's verdict to stand on the contract claim. Nor may we on this record second-guess the district court's handling of the damages issue. Simon presented evidence, through -22- an economist and multiple witnesses involved in the Maine seafood industry, that MCTC's failure to pay its debts had a lasting financial impact on him.15 Although the Navons now challenge as legal error certain premises upon which the economist, McCausland, relied, they neither objected to this testimony when it was presented nor argued at the close of the evidence that Simon had failed as a matter of law to prove breach of contract damages.16 The district court nevertheless agreed that McCausland's testimony was flawed, that the jury's verdict accepting his view was against the weight of the evidence, and that a new trial on damages should be held unless Simon accepted a substantial remittitur. We think the court's response was appropriate and complete; it recognized both that Simon produced evidence of harm  ____________________ 15 Simon testified that salmon farmers in Eastport, with whom he did substantial business, won't sell him fish anymore because they are still owed money by MCTC. One fisherman, Prenier, stated that he was leery of doing business with Simon in the aftermath of the MCTC problems, and that Simon's reputation in the industry has not been repaired. Colon McLernon, owner of Maine Pride Salmon, testified that "our company has moved product to other companies and has stayed away from Mr. Simon." 16 One of the Navons' specific complaints centers on McCausland's reduction of Simon's 1992 and 1993 income by losses incurred at Rain Forest, the company he partially owned that took over some of MCTC's business. The Navons note that Simon answered in the negative when asked the following question: "You cannot lay the blame for any of the problems of Rain Forest at the feet of the Navons, isn't that right, for 1992?" Whatever that question and answer are worth with respect to Simon's 1993 ____ income, we note that the jury could have understood the response as a misstatement in light of other less ambiguous testimony concerning the inability to do business with downeast fishermen following MCTC's demise.  -23- and that the jury's verdict improperly adopted his exaggerated claims regarding the extent of that harm. We find no abuse of discretion. VI. Undue Passion, Bias, Prejudice  ______________________________ The Navons point to eleven events at trial -- including certain court rulings and comments by opposing counsel -- that they contend created an atmosphere of bias and prejudice toward them and led the jury to award grossly excessive damages. They claim that one or more of these events independently, and certainly the cumulative effect of all of them, constituted reversible error requiring a new trial. We have considered each of their points, many of which were not raised at the appropriate time before the trial court, but find that none warrants a total rejection of the jury's verdict. We do not say that the Navons' argument is entirely without force; we hold only that we are satisfied that the district court was within its discretion to reject the claims it considered and that, particularly in light of the need for a new trial on defamation, no manifest injustice occurred that would cause us to disturb any more of the jury's determinations.  VII. Conclusion __________ We summarize our holdings as follows: (1) Simon has failed, as a matter of law, to prove an abuse of process, and the judgment of the district court in his favor is reversed. -24- (2) The jury's finding that the Cadot letter was defamatory was against the weight of the evidence in light of the Navons' proof that the statements it contained were true. The judgment for Simon on defamation therefore must be vacated, and the claim remanded for a new trial. (3) The compensatory and punitive damages awards on the tort claims, totaling $1.3 million, are vacated. (4) The jury's judgment of liability on the contract claim, and its award of $836,000 in damages, are affirmed. Affirmed in part, reversed in part, vacated in part, and ____________________________________________________________ remanded for proceedings consistent with this opinion. Each __________________________________________________________ ____ party shall bear its own costs. _______________________________ -25-